UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOSEPH BOYD,

                                    Plaintiff,

                                                            Case # 21-CV-6651-FPG

v.

                                                            DECISION AND ORDER

STEPHEN M. OSBORN, ESQ.,

                                    Defendant.

## INTRODUCTION

On September 7, 2021, Plaintiff Joseph Boyd ("Boyd") filed this action in the Supreme Court of the State of New York, Monroe County, against Defendant Stephen M. Osborn, Esq. ("Osborn") asserting a claim for defamation *per se* under New York law.  ECF No. 1 at 10-16. Osborn removed the action to this Court pursuant to 28 U.S.C. § 1332(a) based upon diversity of citizenship between the parties and an amount-in-controversy in excess of the sum or value of $75,000.  *Id.* at 2.

On December 6, 2021, Osborn filed a motion to dismiss pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6), ECF No. 5, and, in response, Boyd filed a cross-motion to amend the complaint with an attached Proposed Amended Complaint ("PAC").  ECF No. 8.  For the reasons that follow, Osborn's motion to dismiss is GRANTED and Boyd's motion to amend is DENIED.

## BACKGROUND

The Court draws the following facts from the PAC, ECF No. 8-3, and accepts them as true to evaluate whether amendment would be futile.  *Case v. Anderson*, No. 16 CIV. 983 (NSR), 2017 WL 3701863, at *6 (S.D.N.Y. Aug. 25, 2017) ("The central inquiry for the Court when considering

a motion to dismiss in tandem with a motion to amend is, therefore, whether the proposed amended complaint can survive the motion to dismiss.").

Joseph Boyd is a professional financial advisor who resides in the Rochester, New York area. ECF No. 8-4 ¶ 3. In 2020, one of Boyd's clients made an investment in a company called Quantum Loop Solutions, Inc. ("QLS"). *Id.* ¶¶ 1, 7. Thereafter, Boyd was elected to QLS's Board of Directors "[i]n his capacity as a financial advisor" to his client-investor. *Id.* ¶ 8.

Around late-September or early-October of that year, Boyd learned of "possible theft of corporate funds" by QLS's President, who was also a member of the Board of Directors, which prompted him to act. *Id.* ¶¶ 9-10. First, Boyd "attempted to call a meeting of the Board of Directors." *Id.* ¶ 11. Additionally, he took further "protective action" by transferring money out of a QLS bank account which "contained funds belonging to the investor whom he represented." ECF No. 8-4 ¶ 8. Boyd transferred these "minority investor[ ] funds" into a separate bank account—a preexisting account that also was in the name of QLS—until such time as there could be an investigation." *Id.* ¶ 12. Boyd "was a signatory" on the account from which he removed the funds. *Id.* ¶ 11. He had been given this designation "for purposes of protecting minority investors in QLS." *Id.* Boyd did not have any control over the account into which he transferred the funds, which, as stated above, was a preexisting QLS account. *Id.* ¶ 15. He made the transfer of the funds for "safekeeping" until an investigation could be undertaken because he had an "obligation to protect" the minority investor. ECF No. 8-4 ¶ 15.

Attorney Stephen Osborn, Esq. was retained as "QLS's legal counsel" and "as an advisor to the corporation." *Id.* ¶¶ 18, 21. Though he "claimed to be the corporation's attorney," Osborn is licensed to practice law in California, but not in New York. *Id.* ¶¶ 21, 32. In his capacity as an advisor to QLS, Osborn sent an email to the Board of Directors on October 10, 2020 "in which he

attacked [Boyd's] motives in attempting to call a Board meeting and then falsely stated that [Boyd]

had engaged in 'attempted theft' and 'illegal actions.'" *Id.* ¶ 14.  Boyd attached a redacted version

of that email to the PAC.[1]  ECF No. 8-4 at 12-15.  In redacted form, the email reads as follows:

> Dear Board Members of Quantum Loop Solutions, Inc.,
>
> My name is Steve Osborn.  I am a partner at Mintz.  Mintz is outside corporate
> counsel for Quantum Loop Solutions, Inc. (the "Company").
>
> Ben Weiner, as Chief Executive Officer of the Company, asked me to review . . .
>
> . . .
>
> Mr. Boyd's illegal actions appear to be personally motivated based upon his quest
> to control this company without the right to do so.
>
> . . .
>
> An unauthorized transfer of corporate funds would be embezzlement, which is
> more commonly known as theft.  This action has both criminal civil implications
> for the perpetrator.
>
> Sincerely yours,
>
> Steve Osborn

*Id.*

Boyd alleges that Osborn's statements about Boyd in the email were "absolutely false."

*Id.* ¶ 14.  After receiving Osborn's email, Boyd "immediately" responded to Osborn and "informed

him that the funds were in a [QLS] account."  ECF No. 8-4 ¶ 16.  This response, "placed [Osborn]

on notice within one hour of sending his October 10, 2020 email . . . that his statements were

---

[1] Osborn urges the Court to review the email in its entirety, rather than the redacted version cited by Boyd.  ECF No. 5-1 at 22-23.  To facilitate such a review, he has filed an unredacted version of the email under seal.  ECF No. 16. Because "courts do not read defamatory statements in isolation," the Court has reviewed the specific statements which Boyd alleges are defamatory in the context of the entire October 10, 2020 email.  *See Biro v. Conde Nast*, 883 F. Supp. 2d 441, 467 (S.D.N.Y. 2012) (where the court read the alleged defamatory statements "in the context of the article as a whole" in ruling on a FRCP 12(b)(6) motion).

false." *Id.* ¶ 23.   However, despite receiving this Boyd's message, Osborn "made no effort whatsoever to withdraw his false statements." *Id.*

On October 13, 2020, the CEO of QLS "noticed a Board meeting" at which the slated agenda called for "[d]iscussion and decision on action after Special Meeting with Joe Boyd." *Id.* ¶¶ 19, 24.   The meeting email invitation indicated that "[a]ll members except Joe Boyd are asked to attend." *Id.* ¶ 24.   After learning of the meeting, Boyd "objected to his exclusion" and was "permitted to attend." ECF No. 8-4 ¶ 26.

The meeting was held on October 15, 2020. *Id.* ¶ 26.   During the meeting, Osborn "continued to make [the] same defamatory and false statements about theft and unlawful conduct by [Boyd] to the Board members of QLS—despite having been provided information that the statements were false." *Id.* ¶ 27.   In response, Boyd "directly confronted" Osborn "as to the falsity of his statements," explaining why it was "clear" that Osborn's statements were false. *Id.* ¶ 29. Rather than disagree, Osborn "begrudgingly" admitted that "his factual statements 'might' be false," doing so to "save face." *Id.* ¶ 29.   For instance, at one point during the meeting, Osborn conceded, "to some extent your comments are fair," and also stated "I don't have all the facts." ECF No. 8-4 ¶ 30.

Osborn's "publication of his false statements to the QLS Board"—both via email and at the special Board meeting—"could easily have destroyed [Boyd's] career and livelihood as a financial advisor and make it impossible for him to provide for his family." *Id.* ¶ 18.   "At a minimum," Osborn's statements "destroyed any potential for [Boyd] to work with those QLS Board members who received the absolutely false and defamatory false statements about him." *Id.* ¶ 18.   Osborn demonstrated a "lack of good faith" in his accusations about Boyd, and his "conduct [was] particularly egregious" because he knew when he made the statements "that . . .

Boyd is a professional financial advisor who depends on his reputation and trustworthiness for his livelihood." *Id.* ¶¶ 21, 32.

Based on the above allegations, Boyd brings a state-law claim against Osborn for defamation *per se*. *Id.* ¶¶ 1, 34. He seeks five million dollars in compensatory damages, punitive damages, and recovery of attorney's fees, costs, and expenses. ECF No. 8-4 at 9.

## DISCUSSION

Osborn moved to dismiss the complaint pursuant to FRCP 12(b)(6) for failure to state a claim upon which relief can be granted. Boyd responded by moving to amend the complaint.

## I.    Motion to Dismiss Standard

In deciding a motion to dismiss, a court "must accept as true all of the factual allegations contained in the complaint," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007) (quoting another source), and "draw all reasonable inferences in Plaintiff's favor." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The application of this standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). "Where a document is not incorporated by reference,

the court may [nevertheless] consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint. *Id.* (citing *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir.2006)) (additional citation omitted). A court also must ensure that there are no disputes "regarding the authenticity or accuracy of the document," nor any dispute regarding the document's relevancy. *Id.* (citing *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir.2006)).

## II.   Leave to Amend Standard

"Rule 15(a)(2) instructs that a court 'should freely give leave [to amend] when justice so requires.'" *Willis v. Rochester Police Dep't*, No. 15-CV-6284-FPG, 2018 WL 4637378, at *2 (W.D.N.Y. Sept. 27, 2018) (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 139-40 (2d Cir. 2013)). A court may, however, deny leave to amend where such amendment would be "futile." *Id.* Amendment is futile if the proposed claim "could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002).

"When—as in this case—a motion to amend is filed in response to a pending motion to dismiss, 'a court has a variety of ways in which' to proceed, 'from denying the motion [to dismiss] as moot to considering the merits of the motion [to dismiss] in light of the [proposed] amended complaint.'" *Willis*, 2018 WL 4637378, at *2 (quoting *Conforti v. Sunbelt Rentals, Inc.*, 201 F. Supp. 3d 278, 291 (E.D.N.Y. 2016)). Here, the Court elects to consider the merits of the motion to dismiss in light of the PAC. Because it concludes that neither the original complaint nor the PAC could withstand Osborn's motion to dismiss, the Court grants the motion to dismiss and denies leave to file the PAC. *See Pettaway v. National Recovery Solutions, LLC*, 955 F.3d 299 (2d Cir. 2020) (approving of the district court's approach in granting a motion to dismiss and

6

denying a motion for leave to amend the complaint, filed in response to the motion to dismiss, because the new allegations could not save plaintiff's claims, *i.e.*, "the amended complaint would not withstand a motion to dismiss").

## III.   Analysis

Under New York law, a plaintiff states a claim for defamation by "proving that the defendant published to a third party a defamatory statement of fact that was false, was made with the applicable level of fault, and either was defamatory *per se* or caused the plaintiff special harm, so long as the statement was not protected by privilege." *Feist v. Paxfire, Inc.*, No. 11 Civ. 5436 (LGS), 2017 WL 177652, at *4 (S.D.N.Y. Jan. 17, 2017) (quoting *Chandok v. Klessig*, 632 F.3d 803, 814 (2d Cir. 2011)).   "A privileged communication is one which, but for the occasion on which it is uttered, would be defamatory and actionable." *Id.*

Here, Osborn argues, *inter alia*, that Boyd's state-law claim for defamation *per se* must be dismissed because Osborn's statements are protected by the litigation privilege and qualified common-interest privilege.  ECF No. 5-1 at 16.  The Court considers below whether either of these privileges bars Boyd's defamation claim.

### A.  Litigation Privilege

"New York courts have long recognized the litigation privilege as a defense to defamation claims." *Conti v. Doe*, 535 F. Supp. 3d 257, 281 (S.D.N.Y. 2021).  "[I]t is well-settled that statements made in the course of litigation are entitled to absolute privilege." *Loughlin v. Goord*, 558 F. Supp. 3d 126, 149 (S.D.N.Y. 2021) (quoting *Front, Inc. v. Khalil*, 28 N.E.3d 15, 18 (2015)). This privilege can be extended to statements "made before litigation has commenced . . . if (1) the

attorney has 'a good faith basis to anticipate litigation' and (2) the statements are 'pertinent to that anticipated litigation.'" *Feist*, 2017 WL 177652, at *4 (citing *Front*, 28 N.E.3d at 20).

Here, Osborn argues that the litigation privilege applies because his "involvement" with this matter "stemmed from the fact that [QLS's] legal rights and obligations required its Corporate Counsel's advice and protection to preserve Board formalities in the context of an acrimonious and escalating shareholder dispute." ECF No. 5-1 at 14. In addition, Osborn contends that the October 10, 2020 email's references to "civil implications" and potential internal Board-related consequences for Boyd based upon his conduct demonstrates that Osborn had a good faith basis to anticipate litigation. *Id.* at 14-15. In response, Boyd argues, *inter alia*, that this privilege does not apply here because "there was no litigation pending or anticipated" on a good faith basis. ECF No. 8-1 at 9-12. The Court agrees.

Neither party asserts that there was pending litigation related to this matter, and there is nothing in the record to indicate otherwise. Nor is there anything that suggests Osborn had a good faith basis to anticipate litigation. Osborn was retained as outside corporate counsel to provide advice on matters related to the transfer of funds from one QLS account to another and on matters related to corporate governance. Counseling and assisting clients on such matters, standing alone, is not sufficient to invoke the litigation privilege. *See Orenstein v. Figel*, 677 F. Supp. 2d 706, 710 (S.D.N.Y. 2009) ("The statements at issue here were not made in the context of a judicial or quasi judicial proceeding: the letter was written by an attorney solely in the context of a private dispute over an invoice for services rendered by one business to another."); *Kurker v. Hill*, 44 Mass. App. Ct. 184, 192 (1998) ("The litigation privilege recognized in our cases, however, would not appear to encompass the defendant attorneys' conduct in counselling and assisting their clients in business matters generally."). Additionally, there is no indication that the October 2010 meeting of the

8

Board of Directors which Boyd attended operated as a "quasi-judicial proceeding" thus rendering the defamatory statement "self-correcting by the very body to whom the statement is made." *See Loughlin v. Goord*, 558 F. Supp. 3d 126, 150 (S.D.N.Y. 2021).

Accordingly, Osborn's statements are not protected by the litigation privilege.

### B. Qualified Common-Interest Privilege

The Court considers next whether the so-called "common-interest privilege" bars Boyd's defamation claim. Rather than being absolute, New York's common-interest privilege is qualified in that it "*may* immunize a declarant from liability for a declaratory statement, *unless* the declarant has abused the privilege." *Conti v. Doe*, 535 F. Supp. 3d 257, 275 (S.D.N.Y. 2021) (emphasis added). "A defendant abuses the privilege if he acts beyond the scope of the privilege, acts with common law malice, or acts with knowledge that the statement was false or with a reckless disregard as to its truth." *Id.* (quoting *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 146 (2d Cir. 2001)) (alterations, internal quotation marks, and additional citation omitted). Common law malice is established by a showing of "spite or ill will." *Kamchi v. Weissman*, 1 N.Y.S.2d 169, 182 (N.Y. App. Div. 3d Dept 2014). It is the defendant's burden to demonstrate the facts upon which the asserted privilege depends. *Conti*, 535, F. Supp. 3d at 275.

"The common-interest privilege extends to a communication made by one person to another upon a subject in which both have an interest." *Moraes v. White*, No. 21 Civ. 4743, 2021 WL 5450604, at *14 (S.D.N.Y. Nov. 22, 2021) (citation & internal quotation marks omitted). This particular privilege "applies only to communications that are 'published to an extremely limited, clearly defined group of private persons with an immediate relationship to the speaker, such as a family member or an employer's own employees.'" *Id.* (quoting *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 99 (2d Cir. 2000)). "To invoke the privilege, the parties need only have such

a relation to each other as would support a reasonable ground for supposing an innocent motive for imparting the information." *Id.* (quoting *Scott v. Thayer*, 75 N.Y.S.3d 603, 605 (2018)) (internal quotation marks omitted).

Here, Osborn argues that the common-interest privilege protects the statements in his opinion letter because he was acting as QLS's "outside counsel" and he wrote the email to the Board of Directors during, and in furtherance of, that representation.  ECF No. 5-1 at 16.  In response, Boyd contends that the PAC plausibly pleads that Osborn made the statements at issue "in bad faith," and that they are therefore not protected by the privilege.  ECF No. 8-1 at 3.

### 1.   Whether Privilege Applies

First, the Court considers whether the qualified common-interest privilege applies in the first place.  "New York courts have found that the qualified privilege protects an attorney's statements made in furtherance of her representation of her client." *Orenstein*, 677 F. Supp. 2d at 710 (citation & internal quotation marks omitted).  Indeed, "Courts recognize a common interest privilege in instances where 'the good that may be accomplished by permitting an individual to make a defamatory statement without fear of liability outweighs the harm that may be done to the reputation of others.'" *Loughlin*, 558 F. Supp. 3d at 152 (quoting *Boehner v. Heise*, 734 F. Supp. 2d 389, 399 (S.D.N.Y. 2010)).

Here, Boyd alleges in the PAC that Osborn was retained as "QLS's legal counsel" and "as an advisor to the corporation."  ECF No. 8-4 ¶¶ 18, 21.  Osborn was acting in the course of that representation when he made the alleged defamatory statements.  *See id.* ¶ 1 ("This Complaint seeks damages for defamation per se engaged in by Defendant Steven M. Osborn, Esq. when acting as legal counsel in New York State to [QLS].").  The importance of permitting Osborn to freely make statements while counseling his client on internal business affairs "without fear of liability"

outweighs the potential harm faced by Boyd.  *See Loughlin*, 558 F. Supp. 3d at 152.  As in *Orenstein*, Osborn's statements made during his representation of QLS are protected by the qualified common-interest privilege.  *See Orenstein*, 677 F. Supp. 2d at 710.

Boyd argues that that Osborn cannot rely on any such privilege because he is licensed to practice law in California—not in New York.  However, this argument fails for at least two reasons.  First, the qualified common-interest privilege is not limited to statements made by a licensed attorney.  Rather, it applies more broadly to protect "defamatory communications made by one person to another upon a subject in which both have an interest."  *Orenstein*, 677 F. Supp. 2d at 710.  Here, QLS and its Board of Directors undoubtedly had an interest in the subject of Osborn's communications—QLS's finances and possible fraud.  Moreover, Osborn had been hired by the Board of Directors precisely for the purpose of providing such communications to the Board of Directors.  Boyd does not argue that the common-interest privilege is too narrow to capture such communications.  *See* ECF No. 8-1.  Indeed, Osborn noted this in his reply brief.  *See* ECF No. 9 at 12.

Second, Boyd cites no case law, nor develops any meaningful argument, as to why Osborn's admission to practice law in California but not New York defeats the common-interest privilege.  *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").  Accordingly, Osborn's cursory arguments to the contrary fail and the Court finds that the qualified common-interest privilege applies to the statements made in this case.  However, that does not end the inquiry as the Court must consider whether Boyd has plausibly alleged malice so as to overcome the privilege.

### 2.   Common Law Malice

As stated above, common law malice is established by a showing of "spite or ill will." *Kamchi*, 1 N.Y.S.2d at 182.  In addition, common law malice requires that "spite or ill will" to have been "the one and only cause for publication."  *Hengjun Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) (summary order).

Here, Boyd alleges in the PAC that Osborn made the statements in his capacity as a retained advisor to QLS.  *See* ECF No. 8-4 ¶¶ 18, 21.  Thus, the Court cannot plausibly infer that spite or ill will toward Boyd was "the one and only cause for publication" of the statements made by Osborn.  Instead, the allegations in the PAC show that Osborn was making the statements—at least in part—for the purpose of fulfilling his professional obligation to QLS.  In such situations, courts applying New York law have found no common law malice.  *See Chao*, 476 F. App'x at 895 ("As the district court correctly recognized, defendants made their allegedly defamatory statements in the course of fulfilling their professional obligation to investigate and offer their studied views on Chao's research integrity.").  Accordingly, Boyd has failed to allege facts supporting a plausible inference that Osborn made the statements out of spite or ill will.

### 3.   Actual Malice

Finally, the Court turns to actual malice.  "To show actual malice, a plaintiff must prove that the defendant either knew his statements were false or acted with reckless disregard as to whether they were false."  *Conti*, 535 F. Supp. 3d at 279.  "A person acts with reckless disregard when he publishes the statement at issue entertaining serious doubts as to the truth of the statement or having a high degree of awareness that the statement is probably false."  *Id.*

Here, Boyd alleges Osborn published the statements despite knowing that their source was QLS President Sam Weiner (whom Boyd alleges undertook illegal actions himself) and Benjamin

12

Weiner.  ECF No. 8-4 ¶ 21; ECF No. 8-1 at 4.  Further, he alleges that Osborn published the statements without conducting due diligence as to their truthfulness because he did not "review[ ] the bank records or contact [ ] Mr. Boyd or engage[ ] in any other investigation."  ECF No. 8-4 ¶ 20.  Putting the email aside, Boyd argues that Osborn "continued to make these same defamatory and false statements about theft and unlawful conduct by [Boyd]" at the Board meeting even after Boyd had informed him that the statements were not true.  ECF No. 8-4 ¶ 27.  Each of these arguments fail.

First, the Court notes that "[f]ailure to investigate does not in itself establish bad faith," and thus Boyd's allegations that Osborn should have reviewed additional documents, such as bank records, is not, standing alone, sufficient for a finding of actual malice.  *See Biro v. Conde Nast*, 807 F. 3d 541, 546 (2d Cir. 2015).  Second, even if the Weiners were an unreliable source, Osborn's email makes clear that his statements were made based upon information reviewed in, and an interpretation of, QLS's bylaws, charter, and voting agreement.  In addition, he reviewed and considered an email from Boyd.  *See* ECF No. 16 at 1-4.  To establish actual malice based upon an unreliable source, the statement must have been made "wholly" based upon information from that source.  *See Biro*, 807 F. 3d at 546.  Here, Boyd's allegations, and the October 10, 2020 email itself, do not permit the plausible inference that Osborn wholly relied on statements from the alleged unreliable source in making his statements.

Finally, the Court considers whether Boyd has stated a claim based upon Osborn making the statements at the Board meeting after Boyd had informed him of their falsity.  "Publication in the face of a denial by plaintiffs of a statement's truth does not demonstrate actual malice." *Contemporary Mission, Inc. v. New York Times Co.*, 665 F. Supp. 248, 270 (S.D.N.Y. 1987). Accordingly, Osborn making the statements a second time at that Board meeting despite "being

on notice within one hour of sending his October 10, 2020 email" that the statements in the email were false, is not sufficient to support a finding of actual malice.  ECF No. 8-4 ¶ 23.

Though the PAC is replete with conclusory allegations that Osborn's statements were made "knowingly," "in bad faith," and "intentionally made to damage [Boyd] and his reputation," ECF No. 8-4 ¶¶ 2, 15, 22, the PAC "provides neither factual support for these conclusions nor any explanation of why either [Osborn] or his law firm would have an interest in acting maliciously toward [Boyd]." *See Orenstein*, 677 F. Supp. at 711.

For all the reasons stated above, Boyd has not alleged facts from which the Court can draw a plausible inference that Osborn made the statements with common law or actual malice. Accordingly, the statements are protected by the qualified common-interest privilege and Osborn's motion to dismiss is GRANTED.

## CONCLUSION

For the foregoing reasons, Osborn's motion to dismiss, ECF No. 5, is GRANTED and Boyd's motion to amend the complaint, ECF No. 8, is DENIED.  Because Boyd amended his complaint in response to Osborn's motion, the Court declines to provide him with another opportunity to do so.  The Clerk shall enter judgment and close this case.


IT IS SO ORDERED.

Dated: May 6, 2022
      Rochester, New York

                                                _____
                                                HON. FRANK P. GERACI, JR.
                                                United States District Judge
                                                Western District of New York